## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**totes ISOTONER CORPORATION,**

      **Plaintiff,**

**v.**

**R.G. BARRY CORPORATION,**

      **Defendant.**

**Case No. 2:13-cv-0253**

**JUDGE GREGORY L. FROST**

**Magistrate Judge Norah McCann King**

### OPINION AND ORDER

Currently pending before the Court are the Verified Complaint of Plaintiff totes Isotoner Corporation (ECF No. 1) and Plaintiff's motion for temporary restraining order ("TRO") and preliminary injunction (ECF No. 3).  On March 27, 2013, this case came on for an informal preliminary telephone conference pursuant to S. D. Ohio Civ. R. 65.1(a).  By agreement of the parties, the Court consolidated Plaintiff's motion for TRO and preliminary injunction into one hearing and considered the motion as one for a preliminary injunction.  (ECF No. 11 at PAGEID# 113.)

Pursuant to this Court's briefing schedule, Defendant R.G. Barry Corporation filed a response to Plaintiff's motion for preliminary injunction (ECF No. 23) and Plaintiff filed a reply in support of its motion (ECF No. 25).  The Court held a hearing on Plaintiff's motion on May 2, 2013, at which the parties presented evidence and argument.

Upon consideration of the parties' briefing, arguments, and evidence, the Court **DENIES** Plaintiff's motion for preliminary injunction.

# I.    Background

Plaintiff totes Isotoner Corporation ("Isotoner") is a company known for manufacturing quality gloves and slippers.  Founded as a glove manufacturer in 1910, Isotoner has been selling slippers for more than 40 years.[1]  Isotoner's slippers are sold worldwide.

Defendant R.G. Barry Corporation ("R.G. Barry") is a slipper company that manufactured the world's first foam-soled, soft, washable slipper in 1947.  R.G. Barry markets its slippers under well-known brand names, including Dearfoams®, Foot Petals®, and Baggallini®.  R.G. Barry promotes and sells a wide range of slipper products under its various brand names through numerous marketing channels, including national retail chains, mass merchants, warehouse clubs, department stores, catalogs, specialty retailers, and online retailers.

For several years, both R.G. Barry and Isotoner sold slippers to the J.C. Penney retail chain.  In August 2012, J.C. Penney informed Isotoner that it would cease buying Isotoner slippers in the "Basics" slipper product segment as part of the retailer's decision to reduce the number of vendors from which it bought product.  The "Basics" product segment (also called "Replenishable" in the slipper industry) consists of slipper styles that are sold year-round, as distinguished from the "Fashion" product segment that is primarily sold between October and January each year.  According to Isotoner, most major national retail chains and department stores typically split their slipper purchases roughly evenly between the Basics and Fashion segments.  (Verified Compl. ¶ 9, ECF No. 1.)  The change in J.C. Penney's purchasing strategy for Basics slippers became effective with the Spring 2013 line of merchandise that is presently in J.C. Penney stores.

J.C. Penney asked R.G. Barry to replace Isotoner as the retailer's supplier of slippers in the Basics product segment.  Specifically, J.C. Penney asked R.G. Barry to replace slippers

---

[1] In 1997, Isotoner Corporation merged with the totes Company to form totes Isotoner Corporation.

previously supplied by Isotoner with slippers sold under the Dearfoams brand name.  R.G. Barry agreed and began to work with J.C. Penney to develop a full line of Dearfoams slippers for introduction into J.C. Penney stores in early 2013.  The additional offering would complement the existing Dearfoams product line that was already sold in J.C. Penney stores.

The Dearfoams product line introduced at J.C. Penney in 2013 consists of fourteen slipper designs.  This case involves four of these designs—the satin ballerina slipper, the terry ballerina-style slipper, the terry embroidered clog slipper, and the microterry clog slipper.  R.G. Barry acknowledges that it worked with J.C. Penney to create four "Dearfoams replenishment styles" to replace the four styles previous sold by Isotoner in J.C. Penney stores.  (Nancy Coons Decl. ¶ 11, Def.'s Exh. 1.)  R.G. Barry also contends, however, that it created the new offerings using elements of prior slipper designs created by Dearfoams.  (*Id.*)  In support of this contention, R.G. Barry has placed in the record copies of catalogs showing various styles of Dearfoams slippers offered as far back as the 1980s.

Isotoner argues, however, that the new Dearfoams styles introduced this year at J.C. Penney are copies of Isotoner's best-selling products from its Basics segment.  Isotoner alleges that in fiscal years 2002 to 2013, its total sales of slippers in the Basics category to J.C. Penney exceeded $45 million, with the four slipper styles at issue in this case accounting for $22 million of those sales. (Verified Compl. ¶ 12, ECF No. 1.)  Isotoner continues to sell these styles to other national chains and department stores.  During the same time period (fiscal years 2002 to 2013), Isotoner estimates total sales of these four styles to exceed $100 million, which is more than 56 percent of Isotoner slipper sales in the United States in the Basics segment and more than 15 percent of Isotoner's total sales in all slipper categories.  (*Id.* at ¶ 14.)

In this lawsuit, Isotoner claims that R.G. Barry has infringed Isotoner's protected trade dress with regard to the satin ballerina slipper, the terry ballerina-style slipper, the terry embroidered clog, and the microterry clog.  Placing the companies' respective products side-by-side, Isotoner contends that R.G. Barry's products at issue sold under the Dearfoams brand are remarkably similar to the corresponding Isotoner products they replaced at J.C. Penney.  Below is a sampling of the side-by-side photographs of the products at issue.

SATIN BALLERINA SLIPPER:





TERRY BALLERINA-STYLE SLIPPER:





TERRY EMBROIDERED CLOG:



MICROTERRY CLOG:



(Verified Compl. ¶¶ 55-58, ECF No. 1 at PAGEID# 21-42.)

Isotoner alleges that the R.G. Barry products mimic Isotoner's distinctive trade dress in the slipper styles shown above, in violation of Section 43(a) of Lanham Act, 15 U.S.C. § 1125(a). In the motion before the Court, Isotoner asks for a preliminary injunction ordering R.G. Barry to—

1. Refrain from advertising, marketing, promoting, selling, shipping or distributing any merchandise using the infringing trade dress or any other trade dress that is confusingly similar to it, or otherwise engaging in acts or conduct that would cause confusion as to the source, sponsorship, or affiliation of the slippers' trade dress;

2. Refrain from making any commercial use of the infringing trade dress or any other trade dress that is confusingly similar to it;

3. Deliver to the Court for destruction all packaging, point of sale materials and advertising in its possession or under its control that utilizes the infringing trade dress and to recall all inventories of slippers incorporating any of the infringing trade dress from retailers or third parties and deliver to the Court for destruction all such product; and

4. Immediately send out a notice of recall and take appropriate action to have R.G. Barry's employees and/or agents physically retrieve all such product from each store and warehouse of their customers that uses the infringing trade dress.

Having read the briefing and heard the parties' evidence and argument at the preliminary injunction hearing, the Court now proceeds to the merits of Isotoner's motion.

## II.     Discussion

When ruling on a motion for preliminary injunction, the court must consider and balance four familiar factors:  (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.  *Blue Cross & Blue Shield Mut. of Ohio v. Columbia/HCA Healthcare Corp.*, 110 F.3d 318, 322 (6th Cir.1997); *see also United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004).  These factors are not prerequisites but, rather, factors that the court must balance in a weighing of the equities involved.  *Id.*  The moving party must demonstrate a right to injunctive relief by clear and convincing evidence. *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969 (6th Cir. 2002); *Am. Sys. Consulting, Inc. v. Devier*, No. 2:07-cv-818, 2007 U.S. Dist. LEXIS 66339, at *5-6 (S.D. Ohio Sept. 7, 2007).

In this case, Isotoner seeks a preliminary injunction aimed at enjoining alleged trade dress infringement by R.G. Barry.  Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), protects the unregistered "trade dress" of a product.  As the United States Supreme Court explained: "The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods." *Traffix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001).  A party seeking to recover for alleged trade dress infringement must show that (1) the trade dress in question is *distinctive* in the marketplace, (2) the trade dress is primarily *nonfunctional*, and (3) the trade dress of the competing product is confusingly similar.  *Abercrombie & Fitch Stores, Inc. v. Am. Eagle*

*Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002); *see also Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000).

As the Sixth Circuit noted in *Abercrombie & Fitch*, the concept of "trade dress" has taken on an "expansive meaning," including the design and appearance of a product as well as its container "'and all elements making up the total visual image by which the product is presented to customers.'" *Abercrombie & Fitch*, 280 F.3d at 630 (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995)). "In short: any 'thing' that dresses a good can constitute trade dress." *Id.* The *protectability* of that trade dress, however, is another matter. *Id.* "Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as patent or copyright protects an item, it will be subject to copying." *Traffix Devices*, 532 U.S. at 29. In a case like this one, where the trade dress at issue consists of a product's design, a product's design is distinctive (and therefore protectable) only upon a showing of secondary meaning, which occurs when a design can be said to identify the source of the product rather than the product itself. *See Samara Bros.*, 529 U.S. at 211-16.

With these principles as the backdrop, the Court proceeds to analyze Isotoner's trade dress claims in this case and whether Isotoner's requested injunctive relief is appropriate.

### A.  Likelihood of Success on the Merits: Secondary Meaning

Because this is a case focused on product design, Isotoner can prevail only if it can establish that the designs in question have "secondary meaning." *Id.* That is, Isotoner must show that the public has come to associate the alleged trade dress with Isotoner as the specific source of the product. *See Kendall-Jackson Winery v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998). In deciding whether a product has secondary meaning, a court looks to

seven factors related to the alleged trade dress:  (1) direct consumer testimony, (2) consumer surveys, (3) exclusivity, length, and manner of use, (4) the amount and manner of advertising, (5) the amount of sales and number of customers, (6) established place in the market, and (7) proof of intentional copying.  *Abercrombie*, 280 F.3d at 639 n.14.  In this case, Isotoner emphasizes the second, third, fifth, sixth, and seventh factors.

### 1.  Intentional Copying

The Court first addresses the "intentional copying" factor, as Isotoner places the most importance on it.  Isotoner argues that its trade dress is entitled to a *presumption* of secondary meaning because R.G. Barry has intentionally copied the Isotoner slipper designs at issue in this case.  At the preliminary injunction hearing in this case, Isotoner went so far as to say that the proof of intentional copying was all it needed to show in order to be entitled to preliminary injunctive relief.

Isotoner is correct that intentional copying could give rise to a presumption of secondary meaning.  But intentional copying is not actionable under the Lanham Act *unless* there is evidence that the alleged infringer copied "with the intent to derive a benefit from the reputation of another."  *Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts*, 944 F.2d 1235, 1243 (6th Cir. 1991) (quoting *Zin-Plas Corp. v. Plumbing Quality AGF Co*., 622 F. Supp. 415, 420 (W.D. Mich. 1985)).  "'Where the copying by one party of another's product is not done to deceive purchasers and thus derive a benefit from another's name and reputation, but rather to avail oneself of a design which is attractive and desirable, a case of unfair competition is not made out.'"  *Id.* (quoting *West Point Mfg. v. Detroit Stamping Co.*, 222 F.2d 581, 586 (6th Cir. 1955)).  A finding of intentional copying does no more than raise a rebuttable presumption of secondary meaning.  *DeGidio v. West Group Corp.*, 191 F. Supp. 2d 904, 917 (N.D. Ohio 2001).

"Proof of some logical reason, other than an intent to capitalize on a plaintiff's mark, is sufficient to rebut the presumption." *Id.* (citing *Libbey Glass, Inc. v. Oneida Ltd.*, 61 F. Supp. 2d 700, 708 (N.D. Ohio 1999)).

Isotoner argues that there is evidence of intentional copying by R.G. Barry that entitles Isotoner to a presumption of secondary meaning. The primary evidence relied upon consists of multiple e-mails between an R.G. Barry designer in Columbus, Ohio and product developers in China. The e-mails show that the designer and developer used Isotoner samples of the four slipper styles at issue in creating the R.G. Barry products that Isotoner identifies as infringing upon its trade dress. During the preliminary injunction hearing, Isotoner placed particular emphasis upon e-mails suggesting that R.G. Barry's developer was trying to replicate the "shiny satin" appearance of Isotner's ballerina-style slipper as well as the size and appearance of the decorative bow. Isotoner also emphasized e-mails indicating that the developer was trying to match the weight of the Isotoner's "plush terry" ballerina-style slipper. In addition, Isotoner points to internal e-mails from R.G. Barry, including one that referred to the ballerina slipper being developed as an "Isotoner Knock-off." (Pl. Ex. 11.)

For its part, R.G. Barry disputes that it copied the Isotoner styles in question. Rather, R.G. Barry argues that it developed the new products for J.C. Penney using design elements from products R.G. Barry had already developed. As support for this contention, R.G. Barry cites evidence and testimony indicating that it used design elements that R.G. Barry has used for years in other R.G. Barry products. And there is evidence indicating that R.G. Barry provided the developer in China with samples of R.G. Barry products to assist with the development of the allegedly infringing products.

The Court acknowledges that there is some evidence to support Isotoner's contention that R.G. Barry copied the Isotoner styles at issue in R.G. Barry's development of the allegedly infringing products. The Court does not agree, however, that this evidence entitles Isotoner to a presumption of secondary meaning that justifies the preliminary injunction Isotoner seeks in this case. Even if this Court were to view R.G. Barry's actions as an intentional copying of Isotoner's products, the presumption of secondary meaning that attaches is a *rebuttable* presumption. If R.G. Barry can provide a "logical reason" for the alleged copying of Isotoner's designs, that reason can be sufficient to rebut the presumption. *See Papa Ads, LLC v. Gatehouse Media, Inc.*, 485 F. App'x 53, 56 (6th Cir. 2012).

The existence of the presumption is based upon the presumed intent of the copier to deceive consumers as to the *source* of the product in question. In other words, the copier's intent must be to benefit from the goodwill of the competitor's customers "by getting them to believe that the new product is either the same, or originates from the same source as the product whose trade dress was copied." *Osem Food Indus., Ltd. v. Sherwood Foods, Inc*., 917 F.2d 161, 165 (4th Cir. 1990). Accordingly, the presumption of secondary meaning loses its force when the alleged infringer can show other reasons for copying other than the desire to deceive customers as to the product's source. For example, if the alleged infringer copied a product in order to capitalize on an "attractive and desirable design" rather than to benefit from another's name and reputation, the presumption is not warranted. *See DiGidio*, 191 F. Supp. 2d at 917; *see also Bobrick Washroom Equip., Inc. v. Am. Specialties, Inc.*, No. CV10-6938, 2012 U.S. Dist. LEXIS 111465, at *42 (C.D. Cal. Aug. 8, 2012) (finding presumption of secondary meaning unwarranted when evidence showed that defendant copied plaintiff's design for its perceived aesthetic value, not to deceive consumers as to the source of the product).

In this case, even assuming there was intentional copying by R.G. Barry, the Court finds that R.G. Barry has rebutted the presumption of secondary meaning.  The evidence gleaned from the preliminary injunction hearing fails to demonstrate a likelihood of Isotoner succeeding in an argument that R.G. Barry sought to capitalize on the Isotoner name or reputation in developing the new slipper styles for J.C. Penney.  Rather, the evidence shows that R. G. Barry was trying to accommodate J.C. Penney's desire that particular styles of slipper be replicated after J.C. Penney decided to replace Isotoner slippers in the "basic" category with Dearfoams slippers.  At most, the evidence shows that R.G. Barry was trying to capitalize on the particular *design* of the Isotoner slippers at issue and not the Isotoner name.  Indeed, R.G. Barry saw the additional offering as a way to "complement the existing Dearfoams product line."  (Coons Decl. ¶ 9 at PAGEID# 221.)  R.G. Barry's actions indicate an attempt to avail itself (at the request of its customer, J.C. Penney) of attractive and desirable designs and not an attempt to deceive purchasers into thinking they were buying Isotoner slippers.  *See Ferrari S.P.A.*, 944 F.3d at 1243.

The evidence submitted by the parties fails to convince this Court that Isotoner is entitled to a presumption of secondary meaning because of "intentional copying," even if this Court were to indulge Isotoner's position that R.G. Barry copied the Isotoner slipper styles at issue.  Accordingly, Isotoner must establish secondary meaning by other means in order to be entitled to injunctive relief.

### 2.  Other Evidence of Secondary Meaning

Apart from the presumption of secondary meaning that the Court rejects, Isotoner relies on other evidence in an attempt to buttress a finding that the slipper styles at issue carry secondary meaning and are therefore protectable trade dress.  Again, whether secondary meaning

exists depends upon whether the alleged trade dress has become distinctive of the trade dress owner's goods in commerce.  *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).

Isotoner first claims that the ballerina-style slipper "has been exclusively associated with Isotoner," relying on a 2006 "consumer survey."  (ECF No. 3-1 at PAGEID# 84.)  According to Isotoner, the survey reflects the strength of consumers' association of the ballerina design with the Isotoner brand.  (*Id.*)  R.G. Barry disagrees, disputing the premise that Isotoner's supposed "consumer survey" was a survey at all.  Rather, R.G. Barry argues that Isotoner's "survey" was actually a "brand equity study" that says nothing about the trade dress elements at issue in this case.  (ECF No. 23-1 at PAGEID# 209.)

On the "consumer survey" issue, R.G. Barry has the better of the arguments.  It is true that consumer surveys demonstrating consumer recognition of trade dress elements at issue can be relevant to the secondary meaning inquiry.  *See Jeffrey Milstein*, 58 F.3d at 34.  But the Court does not view the consumer evidence submitted by Isotoner to be persuasive on the issue of secondary meaning.  The study is not a "consumer study," but was rather in the nature of a focus group exercise that dealt only with the Isotoner brand generally; it was not aimed at gleaning consumer opinions on trade dress.  Indeed, the study itself cuts against a finding of protectable trade dress as the study found that the Isotoner brand "is most known for function over fashion." Isotoner therefore cannot use this study as convincing evidence of protectable trade dress, regardless of the fact that consumers equated the brand with the ballerina slipper.

The Court is not persuaded by Isotoner's other arguments concerning secondary meaning. Isotoner argues that the four slipper designs at issue in this case have been "big sellers" among the company's "Basics" segment of slippers.  Specifically to J.C. Penney, Isotoner says it has

sold $20,000,000 in these styles to that retailer since 2002, accounting for nearly half of Isotoner's Basics slippers sales to J.C. Penney.  (Verified Compl. ¶ 12.)  Isotoner argues that these strong sales figures show that the slipper styles at issue have "secondary meaning."

The Court is not persuaded by Isotoner's argument.  While it is true that the amount of sales and number of customers are among the factors the Court can consider in deciding whether secondary meaning exists in trade dress, the Court finds here that the sales figures are not enough for Isotoner to sustain its burden of showing secondary meaning.  Although the sales numbers could be indicative of the styles at issue being the most popular of Isotoner's Basics segment, it remains an inferential leap to conclude that customers equate those styles with Isotoner as the product's source.  In the Court's view, the slipper designs that are at issue in this case are ubiquitous and not associated with any particular seller or manufacturer.  Absent some compelling evidence that these styles are synonymous with Isotoner—evidence that is lacking so far—the Court cannot find that Isotoner is likely to succeed in showing secondary meaning.

**B.  Likelihood of Success on the Merits: Isotoner's Alleged Trade Dress Elements.**

Having found the absence of secondary meaning, the Court could find on that basis alone that Isotoner has failed to show a likelihood of success on the merits of its Lanham Act claim.  Nevertheless, the Court shall proceed to analyze whether Isotoner has shown a likelihood of succeeding on its claim that the elements of its various slipper designs are protectable trade dress.

**1.  Satin Ballerina Slippers**

Isotoner alleges trade dress infringement with regard to four styles of slippers Isotoner sells as part of its "Basics" slipper segment.  The first of these is the satin ballerina-style slipper.  Isotoner identifies its trade dress as a combination of four design components:

- shiny stretch satin fabric;

- decorative arrow bow of similar fabric;

- plump terry-covered thick cushioned insole; and

- pig split leather sole.

(Verified Compl. ¶ 18, ECF No. 1.)

R.G. Barry argues that Isotoner's satin ballerina slipper is not entitled to trade dress

protection.  For one thing, R.G. Barry contends it incorporated Isotoner's claimed elements in

R.G. Barry's own ballerina-style slippers as early as the 1980s.  As evidence of this contention,

R.G. Barry submitted as evidence various catalogs from the 1990s in which the company

displayed ballerina-style slippers.  Because of R.G. Barry's history of manufacturing and selling

ballerina-style slippers, R.G. Barry contends that Isotoner cannot claim to be the "inventor" of

the satin ballerina style design over which it claims trade dress protection.  (ECF No. 23-1 at

PAGEID# 186-87.)

For another thing, R.G. Barry argues in any event that Isotoner cannot claim trade dress

protection over the cited elements because each of them is functional.  For example, the "shiny

stretch satin fabric" is considered a "mainstay" of ballerina slippers because such fabric is

"comfortable, flexible, stretchy, lightweight, and machine washable."  (Bray Decl. ¶ 12 at

PAGEID# 228.)  The "decorative bow" is also a functional component, argues R.G. Barry,

because the narrow bow "defines" a ballerina slipper; in other words, it wouldn't *be* a "ballerina

slipper" without the presence of the bow.  (*Id.* at PAGEID# 229.)  As for the terry-covered insole

is also functional because it is "comfortable, machine washable, colorfast, abrasion resistant and

stretchy, which is required in this slipper construction, and is ubiquitous for slippers."

For its part, Isotoner disputes the notion that the elements of the ballerina slipper's alleged trade dress are functional.  This Court finds, however, that Isotoner is not likely to succeed on this point.  R.G. Barry offered testimony from its Vice President of Design and Product Development, Walter Bray, Jr., that convincingly demonstrated the functionality of each element Isotoner seeks to protect.  For example, Bray noted that the shiny satin fabric is a "mainstay" for ballerina slippers due to its flexibility, stretchiness, light weight, and machine washability.  Further, the narrow bow is synonymous with the ballerina shoe; it would not be a true "ballerina" style without a bow.  The terry cloth material is functional for its comfort and moisture control and is, in any event, "ubiquitous for slippers."  (ECF No. 23-1 at PAGEID# 188 (citing Bray Decl.).)  Finally, there is deposition testimony in the record from Isotoner witnesses about the functionality of the pig split leather sole.  The sole is functional because it is not only reflective or a true ballerina slipper but also provides traction, preventing the wearer from slipping.  Isotoner did not present clear and convincing evidence to show it had a likelihood of demonstrating non-functionality, which would be its burden at trial.  *See Abercrombie & Fitch*, 280 F.3d at 641.

Regardless of the functionality of the alleged trade dress elements on an individualized basis, Isotoner contends that it may still establish a viable trade dress claim.  Relying heavily on *Abercrombie & Fitch*, Isotoner contends that the *arrangement* or *combination* of certain functional features can still result in protectable trade dress.  In other words, the separately functional features of a product "can constitute more than the sum of its non-protectable parts." *Id.* at 644; *see also Kendall-Jackson*, 150 F.3d at 1050 (describing the proper inquiry as "not whether individual features of a product are functional or nondistinctive but whether the whole collection of features taken together are functional or nondistinctive").  Thus, even if the trade

dress elements of the ballerina slipper are all functional, Isotoner contends that the product itself

can nevertheless be protectable.

The Court does not find that Isotoner is likely to succeed on the merits of a trade dress

claim based on the "combination" or "arrangement" of elements in the ballerina slipper.  The

Sixth Circuit rejected just such a claim when addressing the clothing design arguments in

*Abercrombie & Fitch*:

> Finally, Abercrombie is not saved by its characterization of its trade dress as the combination of different design features on its clothing: denying American or other producers the right to combine these functional design features with their own trademarks on clothing bearing certain generic designs . . . made from generic fabrics would undoubtedly force these competitors to spend money to design around Abercrombie's creations. There can be no dispute that preventing other producers from combining these design elements in the way Abercrombie does would prevent them from competing effectively in the market for casual clothing aimed at young people. No reasonable jury could find to the contrary.

*Id.* at 644.

This Court could substitute "Isotoner" for "Abercrombie," "R.G. Barry" for "American,"

and "slippers" for "clothing" and the passage would be just as applicable.  Isotoner does not

make out a case for the "combination" or "arrangement" of elements in the ballerina slipper

being any more protectable as trade dress than the individual elements.  R.G. Barry provided

evidence that it has utilized these same elements for at least two decades.  But more than that, the

Court is persuaded by R.G. Barry's argument that providing trade dress protection to the

elements Isotoner claims would force competitors to design around various combinations of

functional elements.  Just as the Sixth Circuit declined to do that in *Abercrombie & Fitch*, so

does this Court.  The elements over which Isotoner seeks protection are ubiquitous in slippers

and the Court is unconvinced that these generic features are combined in some "unique and

source identifying way."  *Indonesian Imps., Inc. v. Smith*, Nos. C97-3534 and C98-2494, 1999

U.S. Dist. LEXIS 4237, at *21-22 (N.D. Cal. Mar. 30, 1999).  Although the Court is mindful that it must view the alleged trade dress elements as a whole rather than on an individualized basis, the Court cannot say that Isotoner has shown a likelihood of succeeding in a showing that its version of the satin ballerina slipper is so distinctive as to be protectable under the Lanham Act.

### 2. Terrycloth Ballerina-Style Slippers

Isotoner also claims trade dress protection over its stretch terrycloth ballerina-style slipper. Specifically, Isotoner cites the following elements in combination to be protectable trade dress:

- Plush stretch terry cotton/polyester blend fabric;

- Decorative satin bow; and

- Thick terry-covered cushioned insole

(Verified Compl. ¶ 23, ECF No. 1 at PAGEID# 9.)

For similar reasons as those cited above with regard to the satin ballerina slippers, the Court finds that Isotoner has not met its burden of showing a likelihood of success on the merits of showing protectable trade dress for the terrycloth ballerina-style slipper at issue.  Like the satin style slipper, R. G. Barry presented evidence that it has been selling the same style of slipper for decades, with its use of the style predating Isotoner's use of the style.  But more importantly than R.G. Barry's prior use of a similar style, the elements Isotoner seeks to protect are functional.  Indeed, there is testimony in the record to show that the terry cotton/polyester blend fabric is lightweight, comfortable, absorbs moisture, and is machine washable.  As with other ballerina-style slippers, the satin bow is common.  And the thick terry-covered insole is a comfort element, which is a functional feature of the slipper.  Thus, the Court finds at this stage that Isotoner has not shown that any of the claimed elements is non-functional.

Nor can Isotoner rely on the combination of the elements as protectable trade dress under *Abercrombie & Fitch*.  As noted above, for trade dress protection to attach to a combination of non-protectable elements, the individual generic features must be combined in such a way as to be unique and identify the source of the product.  *Indonesian Imps.*, 1999 U.S. Dist. LEXIS 4237, at *22.  Just as the Court could not find such uniqueness with regard to Isotoner's satin ballerina slippers, nor can the Court find it in the terrycloth ballerina-style slippers.  Isotoner's terrycloth ballerina-style slipper is similar to styles previously on the market and does not have the distinctiveness necessary to be worthy of trade dress protection.  Accordingly, the Court finds that Isotoner has failed to show a likelihood of succeeding on a claim that R.G. Barry has infringed Isotoner's trade dress with regard to the terrycloth ballerina-style slipper.

### 3.  Terry Embroidered Clog with Floral Pattern

Isotoner also claims that R.G. Barry has infringed its trade dress with respect to the "microterry clog" style of slipper.  In its verified complaint, Isotoner describes the "distinctive trade dress" as consisting of "terry fabric with a small pastel floral all-over embroidered pattern on terry material and a side stitched outsole."  (Verified Compl. ¶ 26, ECF No. 1 at PAGEID# 10.)  At the preliminary injunction hearing, Isotoner's counsel clarified that Isotoner claims trade dress protection over the overall appearance of the combination of these elements.

In light of Isotoner's focus on the "combination" of the aforementioned elements, the Court need not delve into the question of whether the individual elements are functional.  By focusing on the combination of elements, the Court deems Isotoner to have conceded (for purposes of this preliminary injunction proceeding only) that the terry fabric and side-stitched

outsole are functional elements.[2]  But for similar reasons as those set forth above with regard to the first two slipper styles, Isotoner has not shown a likelihood of succeeding on the merits of its claim that the "combination" of the functional elements of the microterry clog creates a protectable trade dress.

The combination of elements that Isotoner claims as trade dress do not appear to be unique based on the evidence submitted to the Court in connection with the preliminary injunction proceeding.  Catalog excerpts submitted by R.G. Barry establish that it manufactured and marketed microterry clog style slippers since the 1990s.  Indeed, the catalogs reveal R.G. Barry products (under the Dearfoams name) with floral embroidery similar to the allegedly infringing products R.G. Barry has in its current line produced for J.C. Penney.  Moreover, it appears from evidence of record that the combination of elements that Isotoner seeks to protect is a common combination in the slipper industry.  In short, there is nothing about Isotoner's particular microterry clog that appears to be unique in the sense that the product necessarily identifies its source as Isotoner.  *Indonesian Imps.*, 1999 U.S. Dist. LEXIS 4237, at *22. Isotoner has not demonstrated a likelihood of succeeding on the merits of a trade dress claim with respect to the terry embroidered clog.

---

[2] Notably, there was evidence in the record that side stitching was not only a functional element of slippers in the industry, but that (1) R.G. Barry previously obtained a patent for the machine used to make side stitching for slippers and (2) Isotoner began side stitching slippers after it hired R.G. Berry's inventor of the patented machine.  (Bray Decl. ¶ 39, ECF No. 23-3 at PAGEID# 235.)

### 4.  Microterry Clog with Pillowstep Insole

The final style over which Isotoner claims trade dress infringement by R.G. Barry is the "Microterry Clog with Pillowstep Insole."  Isotoner cites as trade dress elements for this slipper—

- Decorative band across the vamp that is made of a fabric with a different looking nap and the fabric of the slipper's body; and

- Side-stitched outsole.

(Verified Compl. ¶  28, ECF No. 1 at PAGEID# 10.)   Isotoner alleges that this slipper style, which it produced in both solid fabric and cheetah-patterned fabric, became Isotoner's fourth biggest selling Basic slipper style at J.C. Penney shortly after being introduced to the store in 2012.  (*Id.* ¶ 27.)

This trade dress infringement claim does not fare any better than Isotoner's other three. Like the embroidered clog, R.G. Barry has produced the microterry clog style described by Isotoner for decades.  Not only that, the elements for which Isotoner claims trade dress protection are, according to the evidence in the record, common in the industry.  (Bray Decl. ¶ 32, ECF No. 23-3.)  The "vamp" across the top of the slipper is a common slipper element that R.G. Barry has utilized for years and is also a functional element of the slipper: it provides needed support to allow the wearer to slip the slipper on his or her foot.  (*Id.* ¶ 35.)  As for the stitched sole, that element is (as described previously) actually an R.G. Barry innovation.  Not only is this element present in a majority of R.G. Barry's product lines for all slippers, it is functional—it is one of the most common ways to attach the slipper's sole to the upper.  (*Id.* at ¶¶ 35, 38.)

Nor can Isotoner establish a likelihood of succeeding on an argument that the combination of elements described above adds up to protectable trade dress.  R.G. Barry has provided evidence that it has utilized this combination of elements for decades, cutting against any finding that these elements are combined in such a way as to identify *Isotoner* as the source of the microterry clog style of slipper.  *Indonesian Imps.*, 1999 U.S. Dist. LEXIS 4237, at *22.

For all of these reasons, the Court finds that Isotoner has failed to meets its burden of showing a likelihood of success on the merits with regard to the distinctiveness and nonfunctionality elements of its trade dress infringement claim.

### C.  Likelihood of Success on the Merits:  Confusion

Another essential element of a trade dress infringement claim is that there be a likelihood of confusion between the infringing products and the alleged trade dress.  *Abercrombie & Fitch*, 280 F.3d at 629.  In determining whether there is a likelihood of confusion in a Lanham Act case, the court should consider (1) the strength of the plaintiff's mark, (2) the relatedness of the goods, (3) the similarity of the marks, (4) evidence of actual confusion, (5) the marketing channels used, (6) the likely degree of purchaser care, (7) the defendant's intent in selecting the mark, and (8) the likelihood of expansion of the product lines.  *Ferrari S.P.A.*, 944 F.2d at 1241-42.  These factors are not necessarily prerequisites but are, rather, a guide to help determine whether confusion would be likely.  "They imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful."  *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988).  Isotoner has not shown a likelihood of succeeding at proving a likelihood of confusion; the factors, as a whole, favor R.G. Barry.

As to the first factor, the Court finds little evidence that Isotoner's alleged trade dress is strong.  On an individual basis, the various trade dress elements that Isotoner identifies in the Basic slippers at issue here are largely generic and functional.  And Isotoner has failed to make a clear and convincing showing that the combination of the individual trade dress elements has secondary meaning in the marketplace.  In short, Isotoner has not shown that there is a strong connection between its brand and the styles of the slippers it claims R.G. Barry has infringed.

While the second and third factors might theoretically favor Isotoner (the goods at issue are slippers and the products at issue are similar), the remaining factors cut in favor of R.G. Barry.  There is no evidence presented to the Court that would suggest actual confusion of Isotoner slippers with Dearfoams slippers in the relevant marketplace (*i.e.*, J.C. Penney).   At the point of sale—such as the J.C. Penney display for basic slippers—the Court sees very little possibility that a consumer would buy a Dearfoams product thinking it was an Isotoner slipper. The evidence before the Court amply demonstrates that the product packaging conspicuously reveals that R.G. Barry's products are sold under the established "Dearfoams" brand name.  The slipper bottoms are noticeably marked with the "Dearfoams" mark and the Dearfoams clover leaf design.  In contrast, the Isotoner products conspicuously show the "Isotoner" brand name, the distinctive Isotoner chevron logo, and in many cases Isotoner's "Secret Sole" or "Pillow Step" trademarks.  This Court viewed the products as they are displayed in stores and sees very little likelihood that a customer would see a Dearfoams product and think "Isotoner" or vice versa, regardless of what the slippers look like style-wise.

In an effort to diminish the significance of the point-of-sale attributes that distinguish a Dearfoams product from an Isotoner product, Isotoner argues that the packaging and branding at the point of sale does not reduce the likelihood of consumer confusion at other points in time.

Relying on *Ferrari*, Isotoner argues that there can be confusion to consumers and potential consumers who see the infringing product outside the marketplace.  This argument is not persuasive, however, given the differences the Court sees in the products.  While the Court is cognizant of the fact that the slipper styles at issue are similar, the Court also notes that R.G. Barry's products are not identical and feature the Dearfoams name prominently on the sole of the slipper.  Finally, unlike the *Ferrari* case in which the Court found that Ferrari's reputation could be damaged by the marketing of replicas, Isotoner has not made a showing that its reputation would be damaged by R.G. Barry selling similar-looking Dearfoams slippers.

Moreover, with regard to the factor of the defendant's intent in selecting the trade dress at issue, the Court does not view R.G. Barry's intent in designing and marketing its allegedly infringing styles to be as nefarious as Isotoner posits.  Though Isotoner theorizes that R.G. Barry sought to capitalize on the Isotoner brand, Isotoner has not made a convincing showing of that theory, at least insofar as preliminary injunctive relief is concerned.  The packaging and branding show that R.G. Barry is seeking to take advantage of its own "Dearfoams" mark, not trying to confuse the customer into thinking he or she is buying an Isotoner slipper.  It appears that R.G. Barry designed the styles at issue to satisfy the desire of J.C. Penney to replace the Isotoner Basic slipper selection with similar styles bearing the Dearfoams brand.

The Court finds that Isotoner has made out a weak case, if not a nonexistent one, regarding the likelihood of confusion.  And without satisfying this element of a Lanham Act claim, Isotoner cannot show a likelihood of succeeding on its claim of trade dress infringement.

### D.  The Remaining Injunction Factors

Having found that Isotoner has not shown a likelihood of succeeding on the merits of its trade dress infringement claim, this Court could simply deny Isotoner's motion on that basis

alone without examining the remaining injunction factors.  *See Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) ("Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal.").  The Court nevertheless addresses the remaining elements and finds that none of them favors Isotoner.

As to irreparable harm, Isotoner argues that its goodwill and reputation stand to be harmed if R.G. Barry is allowed to market the similar styles at J.C. Penney under the Dearfoams name.  Because Isotoner has not demonstrated a likelihood that consumers will be confused as to whether they are purchasing an Isotoner slipper as opposed to a Dearfoams slipper of a similar style, the Court cannot say that Isotoner's goodwill and reputation are at stake.  If anything, the evidence of R.G. Barry's history in the slipper industry suggests that Isotoner's goodwill and reputation would not be harmed at all in the unlikely event that a consumer confuses a Dearfoams basic slipper for an Isotoner one.  Although Isotoner takes issue with the similarity between the R.G. Barry slippers and the Isotoner styles that were "copied," Isotoner has not presented evidence that the R.G. Barry version of the slippers is of such inferior quality that Isotoner's reputation would be damaged if a consumer thought they were Isotoners.

As to the "harm to others" factor, the parties argue about the balance of harms relative to one another.  Both argue the presence of reputational harm to its business and goodwill depending on which way the Court rules on the issuance of a preliminary injunction.  Isotoner claims that R.G. Barry's harm will be purely "economic," but this is simply not true.  If the Court were to issue the preliminary injunction Isotoner seeks—an injunction that would require R.G. Barry to, among other things, recall all inventories of the allegedly infringing slippers *and* issue a notice of recall—R.G. Barry could very well suffer damage to its reputation and its relationship with customers.  Isotoner contends such damage to R.G. Barry is irrelevant, citing cases that

stand for the proposition that the Court will not consider the potential harm that might be suffered by a party who intentionally mimics another's trade dress. *See, e.g., Elizabeth Arden, Inc. v. Belcam, Inc.*, No. 2:05-cv-397, 76 U.S.P.Q. 2d (BNA) 1747, 2005 U.S. Dist. LEXIS 40734, at *18 (S.D. Ohio May 12, 2005) (citing *Cent. Benefits Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1435 (S.D. Ohio 1989)). But as determined above, Isotoner has not shown a likelihood of succeeding on its argument that R.G. Barry intentionally mimicked Isotoner's protectable trade dress.

As to the public interest, this factor favors denial of Isotoner's requested injunctive relief. Since the Court has found no likelihood of confusion, Isotoner cannot rely on "confusion in the marketplace" as a factor in its favor. *See Taubman Co. v. Webfeats*, 319 F.3d 770, 778 (6th Cir. 2002) (finding no negative impact on public interest "absent a likelihood of confusion"). Absent the likelihood of confusion, the Court finds that an injunction would simply stifle competition in similar styles of product with generic features. The Court is also hesitant to issue the sweeping injunctive relief due to the economic waste attendant with the relief sought by Isotoner (*i.e.*, destruction of product, packaging, and point-of-sale materials). In this situation, when Isotoner has made out a weak case for trade dress infringement, the public interest does not favor the sort of destruction of product that Isotoner wants.

In short, the balance of preliminary injunction factors dictates denial of Isotoner's requested injunctive relief.

### III.    Conclusion

The Supreme Court advised that "trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products." *Traffix Devices*, 514 U.S. at 29. Even if the Court indulges the notion that R.G. Barry "copied"

Isotoner's four slipper designs at issue in this case, Isotoner falls short of establishing that this is an instance in which the Lanham Act prohibits the sort of "copying" that took place.  Isotoner has failed to establish the existence of any protectable trade dress that would justify the sweeping preliminary injunction it seeks against R.G. Barry.  For the reasons set forth in this Opinion and Order, the Court **DENIES** Plaintiff's motion for preliminary injunction.  (ECF No. 3.)

      **IT IS SO ORDERED**.

                          _/s/ Gregory L. Frost_____
                          GREGORY L. FROST
                          UNITED STATES DISTRICT JUDGE